IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARIA MAHMOOD | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| NATIONAL BOARD | : |
| OF MEDICAL EXAMINERS | : |
| | : |
| Defendants. | : |

CIVIL ACTION

NO. 2:12-CV-01544-TR

**ORDER**

AND NOW, this _____ day of _____, 2013, upon consideration of the Motion of Defendant National Board of Medical Examiners for Summary Judgment Under Fed. R. Civ. P. 56, and any response thereto, it is hereby ORDERED that the Motion is GRANTED.  Judgment is entered in favor of the National Board of Medical Examiners and against plaintiff Maria Mahmood.


BY THE COURT:


_____
HONORABLE TIMOTHY R. RICE
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
_____
MARIA MAHMOOD                   :
                                :
            Plaintiff,          :
                                :    CIVIL ACTION
        v.                      :
                                :
NATIONAL BOARD                  :    NO. 2:12-CV-01544-TR
OF MEDICAL EXAMINERS            :
                                :
            Defendants.         :
_____
```

**MOTION FOR SUMMARY JUDGMENT**
**OF DEFENDANT NATIONAL BOARD OF MEDICAL EXAMINERS**

For the reasons set forth in the accompanying memorandum of law, defendant National Board of Medical Examiners moves for summary judgment under Fed. R. Civ. P. 56.

Respectfully submitted,

/s/ Michael E. Sacks
Neil J. Hamburg
Michael E. Sacks
ID. Nos. 32175 and 39774
HAMBURG & GOLDEN, P.C.
1601 Market Street, Suite 3310
Philadelphia, PA  19103-1443
(215) 255-8590

Attorneys for Defendant
National Board of Medical
Examiners

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIA MAHMOOD | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | |
| NATIONAL BOARD | : | NO. 2:12-CV-01544-TR |
| OF MEDICAL EXAMINERS | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW OF DEFENDANT NATIONAL BOARD
OF MEDICAL EXAMINERS IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56**

Neil J. Hamburg
Michael E. Sacks
ID. Nos. 32175 and 39774

HAMBURG & GOLDEN, P.C.
1601 Market Street, Suite 3310
Philadelphia, PA  19103-1443
(215) 255-8590

Attorneys for Defendant
National Board of Medical
Examiners

**TABLE OF CONTENTS**

PAGE

I.   INTRODUCTION                                                    1

II.  PROCEDURAL HISTORY                                             3

III. STATEMENT OF UNDISPUTED FACTS SUPPORTING SUMMARY               5
     JUDGMENT

IV.  ARGUMENT                                                       9

     A.   The Standard For Summary Judgment                        9

     B.   Mahmood Did Not Complete The USMLE Step 2 CK            10
          Because The Police Arrested Her For Arson,
          Not Because The NBME Failed To Provide
          Accommodations.

     C.   If Mahmood Had Not Been Arrested, The Most             18
          That Would Have Occurred Would Have Been A
          Short Delay In Her Testing, And Under The
          ADA, A Delay In Providing Accommodations Is
          Not A Denial Of Accommodations.

V.   CONCLUSION                                                    21

## I.    INTRODUCTION

Plaintiff  Maria  Mahmood  (Mahmood)  is  a  former  medical student  who  admitted  to  intentionally  setting  a  fire  at  the Prometric  Test  Center  while  taking  the  United  States  Medical Licensing  Examination  (USMLE)  on  August  8,  2011.[1]   This  is  the National  Board  of  Medical  Examiners'  (NBME's)  motion  for  summary judgment.

As  a  result  of  the  Court's  rulings  on  the  NBME's  motions  to dismiss  Mahmood's  complaint  and  amended  complaint,  only  one claim  remains:  that  the  NBME  denied  Mahmood  reasonable accommodations  and  thereby  violated  the  Americans  with Disabilities  Act  (ADA)  in  connection  with  the  USMLE  Step  2  CK  on August  8,  2011.

As  she  has  done  throughout  this  proceeding,  Mahmood continues  to  minimize  and  excuse  her  behavior  in  setting  the fire,[2]  and  she  has  seemingly  changed  her  story  from  what  she  told

---

[1]     The  National  Board  of  Medical  Examiners  develops  and  administers the  USMLE  together  with  the  Federation  of  State  Medical  Boards. Prometric  is  the  vendor  for  computerized  delivery  of  USMLE.
[2]     At  her  deposition,  Mahmood  repeatedly  stated  that  she  only  lit  a "small  piece  of  tissue  paper"  on  fire,  and  she  denied  soaking  the tissue  in  flammable  liquid,  sticking  it  against  the  wall,  or  using twine  as  a  wick.   ("I  don't  believe  I  used  any  flammable  liquid  to, you  know,  with  the  tissue  paper."   Exhibit  1,  Mahmood  N.T.  85  –  88.) All  of  these  details  are  discussed  in  the  Police  Report,  Exhibit  10. The  NBME  does  not  rely  on  those  details,  or  the  Police  Report,  for purposes  of  summary  judgment.

the USMLE Committee for Individualized Review (USMLE-CIR) following the event.[3]

Mahmood's convenient change of story creates some disputed facts, *but none that are material for purposes of this motion for summary judgment*. As set forth below, the **undisputed** facts establish that:

- The NBME agreed to provide Mahmood with the accommodations she requested for the August 8, 2011, USMLE Step 2 CK;

- The equipment provided for Mahmood on August 8, 2011, worked properly at the beginning of the day;

- The stand for the large screen monitor Mahmood used broke while being moved by Prometric personnel;

- Prometric personnel were trying to locate a replacement monitor when the police questioned Mahmood and then arrested her for arson;

- If Mahmood had not been arrested, either Prometric would have located another monitor for Mahmood to use that day, or the NBME and Prometric would have worked together so

---

[3]     Mahmood told the USMLE-CIR during its investigation that on the morning of the exam she panicked over the possibility of failing, so she created a diversion to delay the exam.  Exhibit 11, Mahmood's January 22, 2012, letter to the USMLE-CIR.  In her amended complaint and at her deposition, she asserted that she lit the fire out of frustration because of a problem with her accommodations.  When asked at her deposition about her January 22, 2012, letter, she said that was "the best explanation I could come up with at that time."  Exhibit 1, Mahmood N.T. 106.

Mahmood could test the next day or on another day of her choosing soon thereafter.

These undisputed facts establish that the NBME did not violate the ADA by failing to provide Mahmood with reasonable accommodations. To the contrary, the NBME accommodated Mahmood on August 8, 2011, and at all other times in connection with the USMLE. At most, had Mahmood not been arrested for arson, the broken stand on the monitor might have delayed Mahmood's examination, and as this Court has already determined, a short delay in providing accommodations is not a denial of accommodations. Accordingly, the NBME is entitled to summary judgment.

## II. PROCEDURAL HISTORY

Mahmood filed her complaint against the NBME on March 27, 2012, and moved for a preliminary and/or permanent injunction on April 19, 2012.

On April 24, 2012, the NBME moved to dismiss the complaint, and on May 25, 2012, the NBME filed its answer in opposition to Mahmood's motion for preliminary and/or permanent injunction.

On June 21, 2012, the Court dismissed Counts I-III of Mahmood's complaint and denied Mahmood's motion for preliminary and/or permanent injunction. The dismissed counts of the complaint alleged civil rights violations in connection with a determination by the USMLE-CIR that Mahmood had engaged in

"irregular behavior" by setting a fire at the Prometric testing center, and its recommendation to the USMLE Composite Committee that she should be barred from taking the USMLE for a period of three years.

The Court's June 21, 2012, opinion granted Mahmood the right to amend her complaint, which she did, to restate her claim for violation of the ADA. Mahmood filed an amended complaint on July 19, 2012, asserting a single cause of action alleging that the NBME violated the ADA by failing to reasonably accommodate her disability. Mahmood alleged a pattern of ADA violations by the NBME in addition to an alleged violation in connection with the August 8, 2011, test date.

On August 8, 2012, the NBME moved to dismiss the amended complaint, and Mahmood answered the motion on September 6, 2012.

On October 31, 2012, the Court granted in part and denied in part the NBME's motion, dismissing the allegations concerning a pattern of ADA violations, and limiting the claim to an alleged failure to accommodate Mahmood's disability in connection with the August 8, 2011, test date. In its October 31, 2012, Order, the Court granted a 30 day discovery period to be followed by motions for summary judgment. The NBME answered the amended complaint on November 14, 2012.

## III. STATEMENT OF UNDISPUTED FACTS SUPPORTING SUMMARY JUDGMENT

1.   The NBME, together with the Federation of State Medical Boards, develops and administers the USMLE, which state medical boards use to assess competence for purposes of initial medical licensure.  Mahmood has taken portions or "Steps" of the USMLE while in medical school, including USMLE Step 1, Step 2 CS (Clinical Skills) and Step 2 CK (Clinical Knowledge).  Exhibit 12, Declaration of Catherine Farmer, Psy.D.

2.   For each Step of the USMLE taken by Mahmood since 2007, including those she passed and those she did not pass, the NBME granted accommodations for her visual disability based upon the medical information she provided.  Exhibit 12, Declaration of Catherine Farmer, Psy.D.

3.   In 2007, the NBME's Office Of Disability Services determined, through an interactive process with Mahmood before she took the USMLE Step 1, that the appropriate accommodations for her visual disability consisted of double time to take exams, the use of a visual aid called a "monocular," a large screen computer monitor, and magnifying software referred to as "ZoomText."  Exhibit 12, Declaration of Catherine Farmer; Exhibit 2 (Step 1 and Step 2 Clinical Knowledge Applicant's Request for Test Accommodations), and Exhibit 3 (Confirmation of Test Accommodations, June 6, 2007).

5

4.    On each occasion in which Mahmood registered for the Step 2 CK exam (after she passed the Step 1 exam), she completed a form entitled "Form for Requesting Subsequent Test Accommodations" on which she indicated that she was requesting the same accommodations on Step 2 CK as she had received for Step 1 (i.e, double the amount of testing time, permission to use her monocular device and ZoomText on a large monitor). Exhibit 1, Mahmood Notes of Testimony (N.T.) 47 – 48; Exhibits 4 – 8 (Requests for Subsequent Test Accommodations and Confirmations of Test Accommodations).

5.    Mahmood's visual disability did not necessitate, and for the August 8, 2011, examination Mahmood did not request, to test in a private testing area.   Exhibit 12, Declaration of Catherine Farmer.

6.    For the August 8, 2011, USMLE Step 2 CK at issue, Mahmood again requested the same accommodations that she had received before, consisting of double the amount of testing time, the use of her monocular, a large screen monitor and ZoomText, and the NBME confirmed that she could test with those accommodations.  Exhibit 1, Mahmood N.T. 50 – 54; Exhibits 6 – 8.   Mahmood did not request a private testing area for the August 8, 2011, USMLE Step 2 CK.  Exhibit 1, Mahmood N.T. 133.

7.    On August 8, 2011, Mahmood arrived at the Prometric testing center and completed the security check-in procedures at

the proctor's desk by approximately 9:00 a.m. Exhibit 1, Mahmood N.T. 60 - 61.

8.   The Prometric Test Center personnel mistakenly seated Mahmood, with her large screen monitor equipped with ZoomText, in a private "special accommodations" (SA) room to take her USMLE Step 2 CK. Exhibit 9-A, Declaration of Roger Meade; Exhibit 9, Prometric Report, p. 3.

9.   Mahmood used the computer and monitor to work on the tutorial that precedes the examination for at least 10 minutes, when the proctor came in and asked her to step outside after she finished the tutorial. When she stepped out, the proctor told Mahmood that she would be seated within the main test center as she had originally scheduled, and asked her to wait in the waiting area until they were ready to seat her. Exhibit 1, Mahmood N.T. 64 - 65.

10.  The large screen monitor with ZoomText functioned properly for Mahmood's use in the private SA room. Exhibit 1, Mahmood N.T. 76.

11.  When the Prometric proctor attempted to move the large screen monitor to the new location in the main testing area, the stand which supports the monitor cracked. The proctor positioned the monitor at the new location so that Mahmood could continue her examination. Exhibit 9-A, Declaration of Roger Meade; Exhibit 9, Prometric Report, p. 3.

12.   The proctor seated Mahmood at the new location in the main testing area.  Mahmood questioned whether the monitor would work as set up, and the proctor replied that it was the best he could do right now, so she should attempt to use it.  Exhibit 1, Mahmood N.T. 79.

13.   Mahmood tried to use the monitor but she found it unstable without the stand.   She requested that Prometric provide a different monitor, and the proctor said they would try to locate one.  Exhibit 1, Mahmood N.T. 79 – 81.

14.   Mahmood went to the waiting area while the Prometric staff tried to locate a different monitor for her use that day, and Prometric suspended her exam (stopped the clock) while they did so.  Exhibit 1, Mahmood N.T. 81 – 82.

15.   At some point during the morning of August 8, 2011, Mahmood went to the bathroom and lit a fire.  Exhibit 1, Mahmood N.T. 83 – 84.

16.   While Prometric personnel were trying to locate a replacement monitor for her, two other Prometric staff came to the waiting area and asked Mahmood to accompany them to a different room.  Exhibit 1, Mahmood N.T. 103 – 104.

17.   Mahmood went to the other room where the police later questioned her, arrested her for arson and then transported her to the police station.  Exhibit 1, Mahmood N.T. 114 – 116, 119.

8

18.  If Mahmood had not set a fire and been arrested, Prometric would have notified the NBME on August 8, 2011, that the stand for the large screen monitor with ZoomText they provided for Mahmood had broken.  If a suitable replacement could not be located by Prometric so that the Mahmood could test that day with the proper accommodations, the NBME would have worked with Prometric and Mahmood so she could have tested the next day or on a date of her choosing soon thereafter.  The NBME would have shipped the large screen monitor to the testing center of her choosing so that she could complete her Step 2 CK examination.  Exhibit 12, Declaration of Catherine Farmer.

## IV.  ARGUMENT

### A.  The Standard For Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, depositions, answers to discovery and affidavits show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue is "genuine" if a reasonable jury could consider the issue and return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

To successfully oppose a motion for summary judgment, the non-moving party must go beyond the pleadings and show, through affidavits, depositions or admissions, that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986). The Court must view the facts and draw all inferences in favor of the non-moving party. Miles v. Lansdowne Borough, 2012 WL 5960874 (E.D.Pa. Nov. 29, 2012, Bartle, J.) When ruling on a motion for summary judgment, the court may only rely on admissible evidence. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id., quoting Anderson, supra, 477 U.S. at 252.

**B.    Mahmood Did Not Complete The USMLE Step 2 CK Because The Police Arrested Her For Arson, Not Because The NBME Failed To Provide Accommodations.**

As a private entity that offers examinations related to licensing or credentialing, the NBME is required to offer accommodations to persons with disabilities to make such examinations accessible:

> Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."

42 U.S.C. § 12189.

10

To show a violation of the ADA, a plaintiff must show that she is disabled, that her requests for accommodations were reasonable, and that the requests were denied.  <u>Ware v. Wyoming Bd. of Law Examiners</u>.  973 F.Supp. 1339, 1356 (D.Wyo. 1997), aff'd., 161 F.3d 19 (10th Cir. 1998).

In its October 31, 2012, opinion, the Court framed the failure to accommodate issue as follows:

> To succeed on her failure-to-accommodate claim, Mahmood must prove NBME denied her the equipment necessary to take the exams.  The ADA requires NBME to offer its exams "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals."  See 42 U.S.C. § 12189.

October 31, 2012, Memorandum Opinion, p. 3.[4]

Mahmood acknowledges in the amended complaint that the NBME granted her requested accommodations, but states that Prometric "failed to provide them on the testing date."  Exhibit 13, ¶ 38.  However, Mahmood admitted at her deposition that the equipment was provided to her on August 8, 2011, and that it worked at the beginning of the day:

---

[4]    In footnotes 4 and 8 of the October 31, 2012, memorandum decision, the Court mentions the so-called "best ensures" standard described in <u>Enyart v. National Conference of Bar Examiners, Inc.</u>, 630 F.3d 1150 (9th Cir. 2011).  As the Court noted, the Third Circuit Court of Appeals has not addressed the <u>Enyart</u> standard, and no court in the Circuit has applied it.  Moreover, even if <u>Enyart</u> were the law in this Circuit, the "best ensures" standard would not be not relevant because Mahmood does not allege that different or better accommodations would have "best ensured" that her performance reflected her aptitude rather than her disability.   To the contrary, as set forth below, the question is whether a delay — likely as short as one day — constitutes any kind of denial of accommodations.

Q.  Okay.  Now, you had been in the private testing
    area and using that monitor with zoom text to do
    the tutorial, correct?

A.  Yes.

Q.  And the monitor worked at that time, didn't it?

A.  Yes.

Q.  And the zoom text worked?

A.  Yes.

Q.  So the monitor that you were given in the private
    area worked fine?

A.  Yes.

Q.  And then you were asked to go wait because you
    were going to have to be moved?

A.  Mm-hmm.

Exhibit 1, Mahmood N.T. 76 – 77.

Mahmood further alleges that "another candidate with disabilities came to take an examination, and plaintiff's seat at the examination was given to the other candidate.  This is tantamount to discrimination and denial of equal opportunity." Exhibit 13, ¶ 42.

Mahmood's claim that Prometric gave "her seat" to "another candidate with disabilities" and thereby discriminated against her is factually and legally wrong.  Although Mahmood maintained at her deposition that Prometric "gave preference" to another candidate by moving Mahmood out of the separate testing area, she acknowledged that she had neither requested nor been granted

12

a private testing area as an accommodation for her visual disability, and she had no idea whether, in fact, the other individual had been granted a private testing area as an accommodation for that individual's disability. Exhibit 1, Mahmood N.T. 133. Catherine Farmer, the Director of Disability Services for the NBME, confirmed that Mahmood never requested, and the NBME never granted, a private testing area as an accommodation for Mahmood's visual disability. Exhibit 12.

The Prometric Report explains that the proctors erroneously placed Mahmood in the SA room, and moved Mahmood to the main testing area when a test candidate who was scheduled for the SA room arrived:

> **Details on the Technical Issue** — *Ms. Mahmood had arranged for an extra large screen monitor and Zoom Text, but she was **not** actually scheduled to test in the S/A room. She was to use this equipment at a normal workstation. Another candidate had arrived who was scheduled for the S/A room. The TCAs [proctors] were attempting to move Ms. Mahmood's monitor to the main testing area, when the monitor stand broke. They were able to place the monitor on the stand so it was still viewable. However, Ms. Mahmood said she would be moving the monitor a lot and wanted a new monitor. The TCAs asked her to wait in the reception area while they tried to resolve this issue.*

See Exhibits 9 and 9-A.

The Prometric Report therefore disproves Mahmood's allegation in the amended complaint that Prometric gave her accommodations to someone else, and there is no evidence to the

contrary.   Exhibit 9 and 9-A; see also Exhibit 1, Mahmood N.T. 79 - 81.

The relevant question, therefore, is whether the NBME or Prometric denied Mahmood the use of a large-screen monitor with ZoomText following the move to the main seating area.   Clearly the answer is no.   Mahmood testified that when she found the monitor to be unacceptable, she asked the Prometric proctor to find a new monitor for her to use, and the proctor said he would try to do so.

> Q.   Okay.   And what happened when you asked the monitor -- when you told the monitor, you know, this is not a good situation, could you please provide me with a working monitor.   What happened then?
>
> A.   I got the impression that he wasn't very happy about it.   But he said that he'd try to find one.
>
> Q.   Okay.
>
> A.   Then there was conversations with, you know, the other proctor, and they were both on phones.
>
> Q.   Where were you?
>
> A.   I was in the waiting area.
>
> Q.   When did you go to the waiting area?
>
> A.   When I told the proctor that I wasn't happy with the monitor -- with the LCD screen.
>
> Q.   And he said go wait in the -- did he tell you to go wait in the waiting area?
>
> A.   Yeah.   He said that, you know, my test would be suspended, and that, you know -- to have, you know -- to wait while they were working on it.

Q.   Okay.   So he said wait there while we try to
     figure this out?

A.   Yeah, something like that.

Q.   And you went to the waiting area?

A.   Yes.

Exhibit 1, Mahmood N.T. 80 - 81.

Whether Prometric could have found a replacement monitor to

use that day is an unanswered question because they never got to

that point.   Rather, as Mahmood admitted at her deposition,

while Prometric attempted to locate an appropriate monitor for

her, the police began to question her about setting the fire,

then arrested her and took her into custody:

Q.   Now, a moment ago you said at some point you went
     back into the area where the proctor's desk is,
     where the security is done.

A.   Yeah.

Q.   When did that happen?

A.   Came back from the bathroom.   I waited for -- you
     know, for them to tell me about if any progress
     had been done with the monitor.

Q.   Okay.

A.   And then I peeked into the room to ask them if
     any progress had been done, and I was told they
     were still working on it.

Q.   So you didn't go and have an extended stay in
     that room where the security is?

A.   No.

Q.   Okay.   You peeked in.   You had a quick — you
     asked them what's the status.   They told you

15

they're still working on it.  And then you went
back into the waiting area?

A.    Yes.

Q.    And in the waiting area, is where you had the
conversation with the two other Prometric
employees where they asked you to go to a
different room?

A.    Yes.

(Exhibit 1, Mahmood N.T. 103 - 104.)

                            *    *    *

Q.    So you're in this separate room for what seemed
like a long time, at least ten minutes?

A.    Mm-hmm.

Q.    And what happened next?

A.    At that point, I -- well, at some point, I
stepped out to see what was going on and asked
to, you know, why I wasn't provided with my
belongings.  And even though that they said that
my exam was suspended, they still gave the
explanation of something to the effect of because
I was still going, you know, giving my exam, that
I couldn't have my belongings with me.  You know,
I tried to -- I didn't quite understand why that
was.  You know, those were two conflicting — two
conflicting things that they were saying to me.
So I went back in and waited some more.  And at
some point, the police arrived and they
questioned me a little bit.

Q.    In that same room?

A.    At first, yeah.

Q.    Okay.  And what do you recall about the police
questioning, the first part of that, what do you
remember?

A.    Not a lot.  I don't remember anything specific
about -- about the questions they asked.

                              16

*   *   *

Q.   Okay.   You said that they came into the room
     where the Prometric people had placed you.  Did
     they take you to a different room?

A.   Yes.

Q.   And was all of this on the 13th floor?

A.   I believe so.   I don't remember climbing any
     stairs or going down any stairs.

*   *   *

Q.   How long were you questioned by the police before
     they took you somewhere else?

A.   I wasn't really questioned by the police, you
     know, other than, like I said before, asking my
     name and, you know, generic questions of that
     nature.   They didn't ask me anything specific
     other than that.

Q.   Okay.   And at some point, did they arrest you at
     the center?

A.   Yes.

Q.   Did they put you in handcuffs?

A.   Yes.

Q.   Were you allowed to see your father at that
     point?

A.   No.  I didn't see my father.

Q.   Did they take you in a police car?

A.   Yes.

Q.   Did they tell you why they were arresting you?

A.   They said that I was under arrest for arson.

Exhibit 1, Mahmood N.T. 115 - 119.

17

Accordingly, by Mahmood's own testimony, the Prometric proctors told her they would try to find her a monitor that she could use, and while she waited, other Prometric personnel arrived and asked Mahmood to accompany them to a different room where she remained until the police took over and eventually arrested her.

These undisputed facts establish that Mahmood's inability to complete testing on August 8, 2011, did not result from the lack of accommodations, since the attempt by Prometric to locate a different monitor for her to use that day ended when the police detained her.  Mahmood's inability to complete her testing on August 8, 2011, resulted from her arrest for arson. Accordingly, there is no evidence from which a reasonable jury could conclude that the NBME or Prometric denied Mahmood accommodations and caused her to be unable to test on August 8, 2011.

**C.    If Mahmood Had Not Been Arrested, The Most That Would Have Occurred Would Have Been A Short Delay In Her Testing, And Under The ADA, A Delay In Providing Accommodations Is Not A Denial Of Accommodations.**

As set forth in the previous section, as a factual matter Mahmood cannot establish that the NBME or Prometric denied her accommodations and prevented her from testing on August 8, 2011, because while Prometric was trying to locate a replacement monitor, the police arrested Mahmood for arson.

However, even if, hypothetically, Mahmood had *not* lit a fire in the bathroom, and had *not* been arrested, and Prometric had a chance to search but determined that it could *not* locate a replacement monitor that day, the NBME would still not be liable for a violation of the ADA because the most that would have occurred would have been a short delay in providing Mahmood with the accommodations she requested.

As set forth in the Declaration of Catherine Farmer, the Director of the NBME's Office of Disability Services, if the NBME had been notified on August 8, 2011, that the large screen monitor provided for Mahmood had broken, and Prometric could not locate an acceptable alternative that day, the NBME would have worked with Prometric and Mahmood so she could have tested shortly thereafter on a day of her choosing. Thus, at most, Mahmood would have incurred a short delay in testing as a result of the broken monitor.

The Court addressed this precise issue in its October 31, 2012, memorandum decision in the context of Mahmood's claim of an alleged pattern of denial by the NBME of reasonable accommodations, and correctly held — consistent with the rulings of other courts — that a defendant does not violate the ADA when

it acts in good faith but is delayed in providing an accommodation.[5] The Court stated:

> Mahmood maintains NBME's delays in providing the requested equipment for these exams effectively denied her accommodations, but she does not cite -- and I am unable to identify -- any cases that address delays under the ADA in the exam context. See Pl.'s Resp. 12. Federal courts addressing delays in other contexts have found no ADA violation where an entity acts in good faith to provide an accommodation, but the plaintiff suffers some delay as a result. See Anderson v. Ross Stores, Inc., No. 99-4056, 2000 WL 1585269, at *9 (N.D. Cal. Oct. 10, 2000) (one-hour delay in retail store because store policies conflicted with customer's request not actual or constructive denial of accommodations); Delgado v. Triborough Bridge & Tunnel Auth., 485 F. Supp. 2d 453 (S.D.N.Y. 2007) (one-month delay in providing employee with larger monitor because monitor was back-ordered not a denial of accommodations).
>
> Mahmood contends there are "factual issues whether NBME acted in good faith" in providing her equipment, but does not identify these issues and alleges no facts that could establish indicating [sic] NBME was unwilling to reasonably accommodate her. See Pl.'s Resp. 12.

October 31, 2012, Memorandum Opinion, at 6-7 (footnote omitted).

As the Court noted in its decision quoted above, Mahmood alluded to factual issues bearing on the NBME's good faith in providing accommodations, but she has not specified such issues, and nothing she has adduced in discovery bears on that issue. The only evidence is Dr. Farmer's declaration stating that the NBME has granted accommodations to Mahmood for each step of the

---

[5]    The NBME incorporates its motion to dismiss the amended complaint, and specifically refers to pages 13 - 19 of its memorandum of law, citing cases to the effect that a delay in providing accommodations is not a violation of the ADA.

USMLE since 2007, and would have worked with Mahmood and Prometric to assure that Mahmood could have completed her testing with a minimal delay if a delay occurred at all.

Because Mahmood has not alleged that the NBME or Prometric refused to resolve the problem with the monitor and provide the proper accommodations, and the only evidence is that Mahmood may have incurred a short delay had she not been arrested for arson, as a matter of law Mahmood cannot show that the NBME violated the ADA by failing to reasonably accommodate her disability.

## V.   CONCLUSION

For all the foregoing reasons, the NBME respectfully submits that there are no disputed issues of material fact, and the NBME is entitled to judgment as a matter of law.

Respectfully submitted,

/s/ Michael E. Sacks
Neil J. Hamburg
Michael E. Sacks
ID. Nos. 32175 and 39774
HAMBURG & GOLDEN, P.C.
1601 Market Street, Suite 3310
Philadelphia, PA  19103-1443
(215) 255-8590

Attorneys for Defendant
National Board of Medical
Examiners

Dated:  January 9, 2013

21

**CERTIFICATE OF SERVICE**

I, Michael Sacks, hereby certify that the foregoing Motion of Defendant the National Board of Medical Examiners for Summary Judgment Under Fed. R. Civ. P. 56, and supporting memorandum of law, have been filed electronically and are now available for viewing and downloading from the Court's Electronic Case Filing System.   I further certify that a copy is being served by regular mail on January 9, 2013, on the following:


        William C. Reil, Esquire
        42 S. 15th Street, Suite 210
        Philadelphia PA 19102



        /s/ Michael E. Sacks
        Michael E. Sacks