# Exhibit "A"

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF PENNSYLVANIA

- - -

MARIA MAHMOOD,
    Plaintiff,

        vs.

NATIONAL BOARD OF MEDICAL
EXAMINERS,
    Defendant.    :  2:12-CV-01544-TR

- - -

Monday, November 19, 2012

- - -

Oral deposition of MARIA MAHMOOD held at the offices of Hamburg & Golden, P.C., 1601 Market Street, Suite 3310, Philadelphia, Pennsylvania, 19103, on the above date, beginning at 12:15 p.m., before Lisa DePascale, a Registered Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Page 126

1  information.
2  Q.  So they became aware of the information not
3  through you?
4  A.  I'm not sure if I specifically told them or if
5  they had gotten the information from somewhere else.
6  Q.  Do you agree that doctors frequently have to
7  make decisions under pressure?
8  A.  Yes.
9  Q.  Do you agree that the ability to maintain
10 composure under pressure is a necessary attribute for
11 a physician?
12 A.  For some physicians, yes.
13 Q.  Do you agree that a doctor who can't function
14 effectively in a stressful situation may negatively
15 impact patient care?
16 A.  That is something that happens frequently.
17 And, yes, I do.
18 Q.  The complaint that you have pending or the
19 grievance that you have pending at the university, if
20 you prevailed on that, would that get you reinstated
21 to the university so that you could test and complete
22 your education?  Is that the purpose?
23 A.  Yes.
24 Q.  And that's pending, correct?

Page 127

1  A.  Yes.
2       MR. SACKS:  Let's just take a three
3  minute break.  I may be done, but I just want to go to
4  the bathroom and be right back and think about it for
5  a second.
6       MR. REIL:  Yeah, I have to go too.  I
7  may have some brief followups.
8       MR. SACKS:  I assumed you wanted to
9  question.
10      (A short break was taken.)
11      MR. SACKS:  I don't have any more
12 questions right now.
13      MR. REIL:  Okay.  I have a few.
14      - - -
15      E X A M I N A T I O N
16      - - -
17 BY MR. REIL:
18 Q.  Ms. Mahmood, isn't is true that you weren't
19 convicted of arson, but rather you pled to criminal
20 mischief?
21 A.  Yes.
22 Q.  Okay.  And your conviction for criminal
23 mischief misdemeanor was expunged, correct?
24 A.  Yes.

Page 128

1       MR. SACKS:  Object to the form of the
2  question.
3  BY MR. REIL:
4  Q.  And when you wrote to the USMLE, were you under
5  psychiatric care at that time?
6  A.  Yes.
7  Q.  I want to take a look at Mahmood 9, if I can.
8  A.  This one?
9  Q.  Yes.  Mahmood 9.  Let me put that over there
10 lest I knock it over.
11      Mahmood 9 is a memorandum from
12 Prometric dated August 16, 2011.  Okay?  Going down a
13 couple paragraphs on the first page, I want to read a
14 sentence under conclusion like the third sentence.  It
15 says, "All other candidates continued to test
16 normally.  No other candidates' exams were affected by
17 the incident."  Did I read that correctly?
18 A.  Yes, I believe so.
19 Q.  On Page 2 of that report, down at the last
20 paragraph the last bullet.  Okay?  The Prometric
21 report says -- I'll read the sentence here:  "In the
22 test center Ms. Mahmood was experiencing technical
23 problems with her Special Accommodation Monitor, so
24 she had executed the S --

Page 129

1       MR. SACKS:  Exited.
2       MR. REIL:  So she had exited.  Thank
3  you, Counsel.
4  BY MR. REIL:
5  Q.  -- the S/A room."  Do you see where it says
6  that?
7  A.  Yes.
8  Q.  And going over to Page 3 of the Prometric
9  report, I want to direct your attention to where it
10 says "Details on the Technical Issue" in bold.  It
11 states, "Ms. Mahmood had arranged for an extra large
12 screen monitor and Zoom Text, but she was not actually
13 scheduled to take the test in the S/A room.  She was
14 to use this equipment at a normal workstation.
15 Another candidate had arrived who was scheduled for
16 the S/A room.  The TCAs were attempting to move
17 Ms. Mahmood's monitor to the main testing area, when
18 the monitor stand broke.  They were able to place the
19 monitor on the stand so that it was still viewable.
20 However, Ms. Mahmood said she would be moving the
21 monitor a lot and wanted a new monitor.  The TCAs
22 asked her to wait in the reception area while they
23 tried to resolve the issue."  Did I read that
24 correctly?

Page 130

1  A.  Yes.
2  Q.  Now, do you agree with the statement there that
3  the monitor was able to be placed on a stand so it was
4  still viewable for you?
5  A.  No.
6  Q.  Okay. Why not?
7  A.  Because, as I said, this is like the main --
8  you know, the main thing why I couldn't continue the
9  exam. The LCD screen was separate from the stand. I
10  mean, there were wires and the guy -- the proctor --
11  the proctor did mention this specifically to not touch
12  the thing because it would fall over. And, you know,
13  it was also next to a window that's -- you know, I
14  don't -- wouldn't expect them to know anything about,
15  you know, albinos, or the associated photophobia, but
16  my main contention was that the monitor was definitely
17  broken and I couldn't work it.
18  Q.  Can you summarize for the record why you
19  believe you were not reasonably accommodated by the
20  NBME on the day in question?
21  A.  Well, considering that, you know, they do keep
22  records of who's testing at what center, at least four
23  weeks in advance from my recollection of having to
24  register a month in advance for any exam, you know, to

Page 131

1  reschedule it anywhere else from one testing center to
2  another, that means that they had a month to prepare
3  and to have a back-up plan in case two students with
4  testing accommodations happen to be accommodated --
5  happen to be testing at the same center.
6      And so they should have had, you know,
7  at least, you know, a back-up plan for that
8  eventuality. That they should be able to accommodate
9  more than one student at a center. And, you know,
10  they were not able to do that. They had prior -- they
11  had the schedule. They had -- you know, they were
12  aware of the situation, but they failed to actually
13  adequately provide reasonable accommodations to both
14  students.
15  Q.  Was the failure to reasonably accommodate you
16  on the day in question, did that occur before the
17  tissue was lit in the bathroom?
18      MR. SACKS:  Object to the form.
19  BY MR. REIL:
20  Q.  You can answer.
21  A.  Yes, it was.
22      MR. REIL:  That's all I have.
23      - - -
24      EXAMINATION

Page 132

1      - - -
2  BY MR. SACKS:
3  Q.  Ms. Mahmood, you don't know the nature of the
4  disability or the accommodations -- strike that.
5      You don't know the nature of the
6  disability of the other examinee who came in and was
7  ultimately given the S/A room, do you?
8  A.  The most that I recall about the individual was
9  that she did not require a wheelchair or any medical
10  equipment. That is the best that I can do.
11  Q.  But you don't know the nature of her
12  disability, do you?
13  A.  No, I do not.
14  Q.  And you don't know what accommodations she had
15  requested or what accommodations the NBME had granted
16  to her, correct?
17  A.  Correct. The only inkling that I have is in
18  this -- in the statement that she was -- she had
19  accommodations for an S/A room so....
20  Q.  Okay. So if her accommodations included having
21  a private room and yours did not, then you really
22  don't whether that's true or not; is that correct?
23  A.  I'm sorry.
24  Q.  Try that again. You don't know whether her

Page 133

1  accommodations included a private testing area, do
2  you?
3  A.  No.
4  Q.  And we've already gone through the fact that
5  you didn't request a private testing area, correct?
6  A.  Yes.
7  Q.  Do you know if that person who came and was
8  given the private room, the S/A room, was taking the
9  USMLE or some other type of test? Do you know?
10  A.  I don't know.
11  Q.  Mr. Reil asked you about the guilty plea to
12  criminal mischief. Am I correct that the guilty plea
13  to criminal mischief was part of an arrangement in
14  which you pled guilty and the prosecutor agreed to
15  drop the arson charge?
16  A.  They -- I'm not sure as to the specifics of
17  that criminal proceeding anymore. I mean, I trusted
18  my lawyer, and I trusted him to carry out -- you know,
19  to represent me the best that he could.
20  Q.  Okay. The criminal mischief that they were
21  talking about was lighting a fire in the bathroom, was
22  it not?
23  A.  I'm not sure. Would not lighting a fire be
24  arson?

Page 134

1  Q.  I think it would.
2      MR. REIL: Well, just answer the
3  questions and don't ask it.
4      THE WITNESS: Well --
5  BY MR. SACKS:
6  Q.  Was there anything else that you did other than
7  lighting a fire?
8  A.  No.
9      MR. SACKS: I think we're done. Thank
10 you.
11     MR. REIL: I'm done also. Thank you.
12     (Deposition concluded at 4:18 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 135

1   CERTIFICATION
2
3
4      I, Lisa DePascale, Registered Reporter, certify
5  that the foregoing is a true and accurate transcript of the
6  foregoing deposition, that the witness was first sworn by me
7  at the time, place and on the date herein before set forth.
8      I further certify that I am neither attorney nor
9  counsel for, not related to nor employed by any of the
10 parties to the action in which this deposition was taken;
11 further, that I am not a relative or employee of any
12 attorney or counsel employed in this case, nor am I
13 financially interested in this action.
14
15
16     _____
17     Lisa DePascale
       Registered Reporter
18     and Notary Public
19
20
21
22
23
24